```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
                           EASTERN DIVISION
```

```
In re:                           :

Ormet Corporation, et al.        :    Case No. 2:04-cv-1151

         Debtors.                :    JUDGE GRAHAM

_____     :    Chapter 11

United Steelworkers of           :    Judge Sellers
America, AFL-CIO-CLC,                 (No. 04-51255)
                                 :
         Appellant,
                                 :
    vs.
                                 :
Ormet Corporation, et al.,
                                 :
         Appellees.
```

OPINION AND ORDER

   The United Steelworkers of America (the "USWA") brings this appeal of the bankruptcy court's October 26, 2004 and November 1, 2004 orders. Both orders deal with 11 U.S.C. §1113, a provision of the Bankruptcy Code that enables Chapter 11 debtors who are parties to collective bargaining agreements to reject the bargaining agreements under certain statutory conditions. The debtor, Ormet Corporation, and the USWA were parties to two collective bargaining agreements. Ormet filed an application under §1113 to reject and modify those agreements, and the bankruptcy court approved the application. The USWA now appeals the bankruptcy court's decision.

   Ormet has moved to dismiss the appeal as equitably moot. Ormet alleges that rejection of the collective bargaining

agreements played an integral part in Ormet's subsequent reorganization. The bankruptcy court confirmed a plan of reorganization shortly after it approved of the §1113 rejection. According to Ormet, the labor cost savings realized by rejecting the bargaining agreements enabled it to emerge from bankruptcy. Ormet contends that by achieving those cost savings, it was able to obtain exit financing, make distributions to creditors, and issue new common stock. Ormet argues that reversal of the bankruptcy court's orders would unravel the reorganization plan and threaten to put Ormet back into bankruptcy.

For the reasons that follow, the Court agrees with Ormet and dismisses this appeal as moot.

## I. Background

### A. Ormet Files for Bankruptcy

Ormet and its subsidiaries produce and market aluminum products in the United States. Ormet operates six facilities in four states. Two of those facilities, a reduction plant and a rolling mill, are located in Hannibal, Ohio.

The USWA represents approximately 900 employees at the reduction plant and 500 employees at the rolling mill. The most recent collective bargaining agreement for union employees at the reduction plant ran from May 12, 2002 to July 31, 2004. The most recent collective bargaining agreement for union employees at the rolling mill ran from April 6, 2001 to August 31, 2004.

On January 30, 2004, Ormet filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio. Ormet continued to operate its business as a

debtor in possession.

    B.    **Rejection of the Collective Bargaining Agreements**

On March 11, 2004, Ormet delivered to the USWA its proposals for modifying the collective bargaining agreements under §1113. The proposals sought to cut labor costs by, among other things, freezing pension plans and requiring employees to contribute toward their health care costs. The proposals called for annual labor cost savings of $14.6 million.

The parties offer different characterizations of what happened next. Ormet states that the USWA rebuffed Ormet's attempts to initiate negotiations over the proposed modifications to the collective bargaining agreements. The USWA, on the other hand, states that Ormet failed to timely and fully respond to the USWA's requests for information that the USWA needed to evaluate the proposals. According to the bankruptcy court,

> The debtors and representatives of the USWA engaged in various communications in the months following delivery of the §1113 proposals. During this time, the debtors made available to the USWA certain information relevant to its evaluation of the proposals. The parties eventually engaged in some bargaining sessions, but their negotiations were limited to non-economic provisions only.

Oct. 26, 2004 Order, p. 3.

On September 22, 2004, Ormet filed a conditional application under §1113 for relief from the reduction plant and rolling mill collective bargaining agreements. The USWA responded to the application in three ways. First, the USWA filed a motion to dismiss the conditional application on September 27. In that motion, the USWA argued that §1113 relief was not available because the collective bargaining agreements had expired before the

application was filed. Second, the USWA filed an objection to the application on October 4. In its objection, the USWA argued that the application did not satisfy the statutory requirements of §1113. Third, the USWA made a counter-proposal to Ormet's proposed modifications on October 5. The USWA proposed, among other things, eliminating a certain number of salaried and hourly positions, restructuring medical benefits for retirees, and selling Ormet to another company.

The bankruptcy court heard oral argument on the USWA's motion to dismiss on October 6, 2004. The court held a three-day evidentiary hearing concerning Ormet's conditional application from October 13 to 15.

On October 26, 2004, the bankruptcy court denied the USWA's motion to dismiss Ormet's conditional application. The bankruptcy court rejected the USWA's argument that §1113 does not apply to expired collective bargaining agreements. The court found no controlling authority on the issue, but noted that §1113 does not use the term "executory" in describing what type of collective bargaining agreements can be rejected. See Oct. 26, 2004 Order, p. 4 ("While §365 speaks to 'executory contracts,' this term does not appear in §1113.").

Less than a week later, the bankruptcy court granted Ormet's application for §1113 relief. The court approved the modifications sought by Ormet, stating that "[t]here was no real challenge either to the necessity of the modifications or to the equitable spread of these provisions among the employees and retirees of the two plants and the sacrifices to be made by the various other constituencies in these cases." Nov. 1, 2004 Order, p. 7. The court found that

4

the USWA "discourage[d] meaningful efforts at negotiations" and that its counter-proposal "would not achieve the labor cost savings all parties agree are required." Id., p. 8. In the court's view, "the balance of the equities" favored rejecting the collective bargaining agreements and adopting Ormet's modifications because the resulting labor cost savings were key to Ormet's reorganization. See id., pp. 8-9.

The USWA did not seek a stay of either the October 26 or the November 1, 2004 order of the bankruptcy court. On November 5, 2004, the USWA timely appealed both orders. The USWA's appeal has been fully briefed, and the Court heard oral argument on the merits of the appeal on July 7, 2005.

On November 22, 2004, the USWA began a strike at the Hannibal facilities. The strike continues to this day.

**C. Implementing the Plan of Reorganization**

Ormet and its subsidiaries submitted a joint plan of reorganization to the bankruptcy court on October 1, 2004. An express condition precedent to confirmation of the plan was that the debtors either enter into new collective bargaining agreements or obtain relief under §1113. See Plan of Reorganization, §10.1(c). As stated above, Ormet obtained §1113 relief on November 1, 2004.

The USWA filed objections to the plan, mainly arguing that the plan was not feasible. The bankruptcy court held a confirmation hearing on November 23, 2004. On December 2, the bankruptcy court issued an order overruling the USWA's objections. The court found that the debtors had presented sufficient evidence to support the feasibility of the plan. The court further found that the plan

"resulted from extensive negotiations between the debtors and various constituencies" and that "the constituents other than the USWA" supported the plan.  Dec. 2, 2004 Order, pp. 2-4.

On December 15, 2004, the bankruptcy court confirmed the reorganization plan.  The USWA did not seek a stay of the confirmation order.  The USWA did appeal the confirmation order, but it has since dismissed that appeal.  The reorganization plan became effective on April 1, 2005.

It is undisputed that the following events occurred after the plan was confirmed.  The reorganized debtors sought exit financing in the amount of $180 million, "relying on financial projections that incorporated the labor costs savings authorized by the Section 1113 Orders."  May 19, 2005 Decl. of Jack Teitz (Chief Financial Officer of Ormet), ¶7. On the effective date, April 1, 2005, the reorganized debtors entered into a $150 million working capital facility with Bank of America.  Id., ¶8.  This replaced a $150 million debtor-in-possession revolving credit facility.  The reorganized debtors also issued $30.9 million in notes to MatlinPatterson Global Advisers LLC and other investment firms, repaying a $30 million debtor-in-possession term loan facility. Id.  The reorganized debtors incurred $5.65 million in fees in connection with the exit financing.  Id.

The reorganized debtors filed amended and restated articles of incorporation and bylaws with the secretary of state.  Id., ¶9. The reorganized debtors assumed management of the company, with a new board of directors appointed by creditors.  Id.

On April 5, 2005, the reorganized debtors paid out $3.54 million to holders of allowed administrative, priority, and secured

claims. Id., ¶10. On April 15, they paid out $5.7 million to holders of 1,350 allowed convenience claims. Id. And on April 29, cash distributions in an unspecified amount were made to holders of allowed claims against an Ormet subsidiary. Id.

Beginning May 6, 2005, the reorganized debtors distributed sixty percent of the company's new common stock to holders of allowed old debt claims and allowed general unsecured claims. Id., ¶11. An unspecified portion of the remaining forty percent of new common stock was set aside for distribution to holders of allowed claims, pending completion of a final list of beneficial owners. Id. The remaining stock was reserved for possible payment to disputed, contingent, and unliquidated pre-petition claims. Id.

## II. Discussion

### A. The Equitable Mootness Doctrine

The equitable mootness doctrine recognizes that "'a plan of reorganization, once implemented, should be disturbed only for compelling reasons.'" City of Covington v. Covington Landing Ltd. Partnership, 71 F.3d 1221, 1225 (6th Cir. 1995) (quoting In re UNR Indus., 20 F.3d 766, 769 (7th Cir. 1994)). Courts developed the doctrine in response to the particular problems presented by the consummation of Chapter 11 reorganization plans. It is a prudential doctrine that protects the need for finality in bankruptcy proceedings and allows third parties to rely on that finality. See In re Grimland, Inc., 243 F.3d 228, 231 (5th Cir. 2001); In re Manges, 29 F.3d 1034, 1039 (5th Cir. 1994) (equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance

upon the plan as implemented"). The doctrine "prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000).

Unlike mootness in the constitutional sense -- where an appeal is moot because it is "impossible for the court to grant any effectual relief whatever," Church of Scientology v. United States, 506 U.S. 9, 12 (1992) -- equitable mootness "occurs where the plan of reorganization is substantially consummated, and where it is not longer 'prudent to upset the plan of reorganization.'" In re Arbors of Houston Assoc. Ltd. Partnership, No. 97-2099, 1999 WL 17649, at *2 (6th Cir. Jan. 4, 1999) (quoting UNR Indus., 20 F.3d at 769). Thus, "a reviewing court may decline to consider the merits of a confirmation order when there has been substantial consummation of the plan such that effective judicial relief is no longer available -- even though there may still be a viable dispute between the parties on appeal." Manges, 29 F.3d at 1039.

A court should examine three factors in determining whether the doctrine of equitable mootness applies: "(1) whether a stay has been obtained; (2) whether the plan has been 'substantially consummated'; and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." City of Covington, 71 F.3d at 1225 (citing Manges, 29 F.3d at 1039). Typically, "the foremost consideration is whether the reorganization plan has been substantially consummated," especially where "'the reorganization involves intricate transactions . . . or where outside investors have relied on the

8

confirmation of the plan.'" PWS Holding, 228 F.3d at 236 (quoting In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996)). Indeed, the Sixth Circuit has stated that "[s]ubstantial consummation raises a presumption that the appeal is moot and should be dismissed." In re Eagle Picher Industries, Inc., Nos. 96-4309, 97-4260, 1998 WL 939869, at *4 (6th Cir. Dec. 21, 1998).

**B. The USWA Did Not Obtain a Stay**

There is no dispute that the USWA did not seek or obtain a stay of either the bankruptcy court's order denying the motion to dismiss the application for §1113 relief or its order granting the application (collectively, the "§1113 rejection orders"). Though failure to seek a stay "is not necessarily fatal to the appellant's ability to proceed," City of Covington, 71 F.3d at 1225-26, parties with objections "should act early and quickly, moving for stays where necessary to protect the status quo." Arbors of Houston, 1999 WL 17649, at *2. Accordingly, the failure to seek a stay is "highly relevant" because "a party that elects not to pursue a stay bears the risk that a speedy implementation of a confirmation order will moot their appeal." Eagle Picher, 1998 WL 939869, at *4; see also UNR Indus., 20 F.3d at 770 ("A stay not sought . . . lead[s][ ] to the implementation of the plan of reorganization. And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal.").

The USWA argues that moving for a stay was not necessary because the plan could not become effective until the confirmation order was a "Final Order." See Plan of Reorganization, §10.2(a).

9

The plan defined a "Final Order" as "an order or judgment of the Bankruptcy Court . . . which has not been reversed, vacated or stayed, and as to which the time to appeal . . . has expired and as to which no appeal . . . shall then be pending . . . or, in the event that an appeal . . . has been sought, [which has been upheld on appeal]." Id., §1.55. Noting that it appealed the confirmation order, the USWA asserts that the order could not have become final while the appeal was pending and, therefore, a stay was unnecessary.

This argument fails for two reasons. First, it is the §1113 rejection orders, not the confirmation plan, from which the USWA is appealing in this case. Even if the USWA can justify not seeking a stay of the confirmation order, it does not change the fact that the USWA never sought a stay of the rejection orders, and the USWA offers no reason why it did not need to. See Collier on Bankruptcy ¶8005.02 (15th ed. 2005) ("The consequence of failing to seek or obtain a stay is that the prevailing party may treat the judgment or order of the bankruptcy judge as final, notwithstanding that an appeal is pending."). Second, the USWA dismissed its appeal of the confirmation order on April 27, 2005, shortly after the plan was to be effective anyway (April 1, 2005). Thus, to the extent that the USWA is correct that its appeal of the confirmation order acted like a stay, the USWA voluntarily dismissed its appeal and, by its own actions, made the confirmation order effective on April 27, 2005.

    C.    **The Plan Has Been Substantially Consummated**

The USWA does not dispute the events that took place to consummate the reorganization plan. Those events are detailed in

the May 19, 2005 declaration of Jack Teitz, Chief Financial Officer of Ormet.  Indeed, the USWA concedes that "[t]he Plan has been largely or totally implemented."  Response Brief of the USWA, p. 6.

The Bankruptcy Code defines "substantial consummation" as:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. §1101(2).

The unchallenged declaration of Mr. Teitz establishes that the reorganized debtors have: transferred all of the shares of new common stock in Ormet that can currently be transferred under the plan; assumed management of the company with a new board of directors; and distributed $3.54 million to holders of allowed administrative, priority, and secured claims and distributed $5.7 million to holders of allowed convenience claims.  In addition, it is uncontested that the reorganized debtors obtained $150 million in exit financing from Bank of America and issued $30.9 million in notes, incurring $5.65 million in fees along the way.  Based on this evidence, the Court finds that the reorganization plan has been substantially consummated.

**D.   Reversal Would Undermine the Plan's Success**

The USWA's chief opposition to the motion to dismiss is that this Court can grant effective relief without unraveling the reorganization plan.  The USWA emphasizes that it is appealing the §1113 rejection orders, not the confirmation order.  The USWA cites

11

In re AppleTree Markets, Inc., 155 B.R. 431 (S.D. Tex. 1993), for the proposition that reversal of a §1113 rejection order does not undo a plan of reorganization.

It is true that the equitable mootness doctrine applies most often to appeals of confirmation orders. See AppleTree, 155 B.R. at 435 (noting that the doctrine "usually" arises in the context of an appeal of a confirmation order). Even so, courts have extended the doctrine to appeals of other types of bankruptcy orders, where the subject matter of the order is "integral" to the plan of reorganization. See Bennett v. Veale, Nos. 93-3016, 93-4180, 1995 WL 385147, at *3 (6th Cir. June 27, 1995). In Bennett, the appellant filed two appeals: one of the confirmation order and one of the dismissal of a shareholder's derivative suit. The Sixth Circuit dismissed both appeals as moot. Appellant, who was a plaintiff in the derivative suit, argued that the dismissal of the suit could be considered separately from the confirmation of the reorganization plan. The court disagreed, finding that the plan had been substantially consummated and that dismissal of the suit was "integral to the Reorganization Plan's formulation and acceptance." Id.

The equitable mootness doctrine was similarly applied in In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996). That case involved appeals of three bankruptcy orders: the confirmation order, an order denying a motion for adequate protection, and an order denying a motion for the establishment of a cash deposit to satisfy the adequate protection claim. The court rejected appellant's argument that relief on appeal as to the adequate protection claim would not have disturbed the reorganization plan

12

because it would have merely resulted in payment of the claim. The court found that the plan had been substantially consummated and that denial of the adequate protection claim was "inextricably intertwined with the implementation of the reorganization." Id. at 561. See also In re US Airways Group, Inc., 369 F.3d 806, 810 (4th Cir. 2004) (dismissing as moot the appeal of an order terminating a pension plan because reversal of that order would have "jeopardize[d]" reorganization); In re Blue Diamond Coal Co., 160 B.R. 574, (E.D. Tenn. 1993) (dismissing as moot the appeal of an order rejecting a proof of claim because reversal would have created a "chaotic situation" for the reorganization plan).

This Court finds that the §1113 rejection orders are integral to the confirmed plan of reorganization. A condition precedent to confirmation of the plan was that the debtors either enter into new collective bargaining agreements or obtain relief under §1113. See Plan of Reorganization, §10.1(c). The rejection orders granted the debtors §1113 relief. They rejected the old collective bargaining agreements and approved of Ormet's proposed modifications. There was no factual dispute before the bankruptcy court that, without some modifications to reduce labor costs by $14.6 million, Ormet would have been forced to liquidate. See Nov. 1, 2004 Order, pp. 7-9. The modifications approved by the rejection orders enabled Ormet to achieve the labor cost savings necessary for it to obtain exit financing and successfully reorganize. See May 19, 2005 Decl. of Jack Teitz, ¶7 (stating that the exit financing "rel[ied] on financial projections that incorporated the labor cost savings authorized by the Section 1113 Orders"). According to Mr. Teitz, "Section 1113 relief was at the core of every financial projection

13

underlying the Plan." June 30, 2005 Decl. of Jack Teitz, ¶3.

The USWA's reliance on AppleTree is not persuasive. In that case, the appellee, AppleTree, moved to dismiss an appeal of a §1113 rejection order as moot. AppleTree argued that reversal of the rejection order would undo the confirmed plan of reorganization. The court denied the motion to dismiss because "AppleTree's legal analysis and factual arguments focus[ed] on the havoc that a successful appeal *of the confirmed Plan* could cause AppleTree and third parties to the Plan rather than the effect of this appeal *of the rejection order* on the confirmed Plan." 155 B.R. at 436 (emphasis in original). The court further stated, "Notably absent from AppleTree's motion to dismiss and its supporting memorandum is an explanation of how the various transactions consummated in reliance on the confirmed Plan or the survival of AppleTree as a viable business would be affected by a successful appeal of the order rejecting the CBAs." Id.

In contrast to Appletree, Ormet has demonstrated how reversal of the rejection orders would undermine the plan and threaten the company's viability. Reversal of the orders would set the modifications aside. Because the prior collective bargaining agreements expired in July and August of 2004, reversal would, by operation of the National Labor Relations Act, result in the reinstatement of the relevant terms and conditions of the old bargaining agreements until the parties bargained to new agreements or reached impasse. See NLRB v. Katz, 369 U.S. 736, 737-39, 743 (1962); Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 206 (1991). Reinstating the old terms and conditions would erase the labor cost savings realized by the modifications. It is

14

uncontested that Ormet cannot operate the Hannibal facilities without those cost savings. Mr. Teitz has stated that to resume operations under the terms of the old bargaining agreements would "entirely wipe out any available excess cash flow the Reorganized Debtors project they will have" and would "result in an immediate default" of the exit financing agreements. June 30, 2005 Decl. of Jack Teitz, ¶4.

Ormet satisfied a condition precedent of the reorganization plan by obtaining §1113 relief. And with the USWA not moving to stay the rejection orders, Ormet secured exit financing based in part on the labor cost savings that were achieved through the rejection orders. See US Airways, 369 F.3d at 810 (dismissing the appeal as moot where reversal of an order terminating a pension plan "would undermine the conditions that the company's lenders placed upon their loans"). Thus, the Court concludes that to reverse the rejection orders would "knock the props out" from under the reorganization plan. In re Roberts Farms, Inc., 652 F.2d 793, 797 (9th Cir. 1981) (dismissing an appeal as moot because reversal of the bankruptcy order would undermine the confirmed plan and "create an unmanageable, uncontrollable situation for the Bankruptcy Court").

The USWA argues that reversing the rejection orders would simply put the parties "back at the bargaining table." True, reversal would require the parties to bargain until impasse, but the USWA disregards the uncertainty it would create. Without the USWA moving to stay the rejections orders, the plan was confirmed and implemented in reliance on the reorganized company benefitting from the cost savings achieved through the rejection orders. The

15

USWA now asks the Court reverse an integral part of the reorganization with no guarantee that Ormet could regain those cost savings when it goes back to the bargaining table. The USWA states that it recognizes the need for the cost savings and would bargain accordingly, but there is no assurance that would happen. Before the bankruptcy court granted §1113 relief, the USWA had the opportunity to bargain with Ormet over how to modify the collective bargaining agreements so as to reach the required cost savings. Though the USWA did not dispute the level of cost savings needed, it nonetheless failed to offer counter-proposals that would have realized those savings. See Nov. 1, 2004 Order, p. 8. If the parties now returned to the bargaining table and again could not reach an agreement, Ormet would have to declare impasse and risk the prospect of defending itself against a unfair labor practice charge before the National Labor Relations Board. Thus, forcing the parties to return to the bargaining table would create uncertainty and undermine the "important policy of bankruptcy law that court-approved reorganization plans be able to go forward unless a stay is obtained." Eagle Picher, 1998 WL 939869 at *4; see also In re Metromedia Fiber Network, Inc., __ F.3d __, 2005 WL 1693838, at *7 (2d Cir. July 21, 2005) (dismissing appeal as equitably moot where the court could not predict "what will happen" if the relief on appeal was granted).

In response to Ormet's claim that reversal would threaten the company's viability, the USWA contends that this claim is belied by Ormet's testimony before the bankruptcy court that it could emerge from bankruptcy even if there was a work stoppage at the Hannibal facilities. This issue arose when the USWA called a strike in

16

November 2004. The USWA argued to the bankruptcy court that the plan was not feasible because the strike would curtail Ormet's operations. Representatives of the debtors testified that Ormet could curtail its operations -- that is, operate all of its facilities other than the two at Hannibal -- for up to two or three years. According to the USWA, that Ormet could emerge from bankruptcy without operating the Hannibal facilities proves that the labor cost savings associated with the rejection orders are no longer essential to the company's survival.

This argument misses the mark. The bankruptcy court found that if Ormet wanted to exit from bankruptcy and keep operating the Hannibal facilities, then Ormet would have to reduce labor costs at those facilities by $14.6 million. The curtailment scenario that the USWA refers to is entirely different. Under that scenario, if Ormet wanted to exit from bankruptcy but not operate the Hannibal facilities because of the strike, then it could manage to do so for only two or three years. After that time, Ormet would have to resume operations at the Hannibal facilities under the terms and conditions of the modified bargaining agreements, as approved in the §1113 rejection orders. At no point did the bankruptcy court find, or Ormet concede, that Ormet could successfully operate the Hannibal facilities post-bankruptcy under the terms of the old collective bargaining agreements.

### E. Reversal Would Harm Third-Party Interests

The Official Committee of Unsecured Creditors of Ormet has filed a brief in support of Ormet's motion to dismiss the appeal. The Committee stresses that general unsecured creditors have materially altered their legal rights based on the rejection

orders. Unsecured creditors have given up their claims against the debtors in exchange for common stock in the company. The Committee argues that if the rejection orders were reversed, Ormet would lose its labor cost savings and likely default on its credit facilities. This in turn, contends the Committee, would likely cause Ormet to liquidate and render the common stock given to creditors worthless.

The Court agrees that third parties have justifiably relied to their detriment on the finality of the §1113 rejection orders and the confirmed plan of reorganization. See Continental Airlines, 91 F.3d at 562 ("High on the list of prudential considerations . . . is the reliance by third parties, in particular investors, on the finality of the transaction."); In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993) (noting that "the ability to achieve finality is essential" in bankruptcy proceedings). Unsecured creditors have released their claims against Ormet in exchange for stock in the reorganized company. See In re Box Brothers Holding Co., 194 B.R. 32, 41 (D. Del. 1996) (dismissing appeal as equitably moot where creditors had "irreparably altered their position in reliance on the Reorganization Plan" by dismissing their claims in exchange for stock). Secured creditors have released their claims in exchange for cash distributions. See id. (noting that cash payments to creditors could not be "undone"). Bank of America and MatlinPatterson have extended $180 million of credit to Ormet, relying on financial projections that incorporated the labor costs savings achieved through the §1113 rejection orders. See In re Club Associates, 956 F.2d 1065, 1070 (11th Cir. 1992) (upholding district court's dismissal of appeal as moot where "a number of investors . . . committed new funds to the 're-emerged Club' with

18

the expectation of receiving a preferred return on their investments").

The situation at hand bears similarity to In re Eagle Picher Industries, Inc., Nos. 96-4309, 97-4260, 1998 WL 939869 (6th Cir. Dec. 21, 1998). Following confirmation of the reorganization plan in that case, new shares of common stock were issued to a trust for the benefit of parties who held claims against the debtor. In addition, the debtors made "distributions to thousands of creditors" and "entered into an unsecured credit facility valued at sixty million with a new lender." 1998 WL 939869 at *5. The Sixth Circuit dismissed the appeal as equitably moot because reversal of the bankruptcy court would "prejudice" the rights of those third parties and because appellants' failure to pursue a stay "allowed a comprehensive change of circumstances to occur." Id. See also US Airways, 369 F.3d at 810-11 (dismissing appeal as moot where the debtor had distributed new stock, paid claims, and obtained exit financing).

As was the case in Eagle Picher, the USWA's failure to seek a stay of the §1113 rejection orders encouraged others to rely on the finality of those orders. Within a few months, a comprehensive change of circumstances took place as the reorganization plan was implemented. See Box Brothers, 194 B.R. at 45 ("[N]either the bankrupt nor its creditors . . . can generally afford to wait while appeals make their way at a relative glacial pace through the two-tiered appellate process."). The Court finds it appropriate to invoke the doctrine of equitable mootness in order to protect the interests of third parties who relied on the finality of the bankruptcy proceedings. See Continental Airlines, 91 F.3d at 559

19

(noting that the mootness doctrine "provides a vehicle whereby the court can prevent substantial harm to numerous parties").

### III. Conclusion

For the reasons stated above, Ormet's May 20, 2005 motion to dismiss the appeal (doc. 15) is GRANTED. The USWA's appeals of the bankruptcy court's October 26, 2004 and November 1, 2004 orders are dismissed as equitably moot.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: August 19, 2005